IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | | |
|---|---|---|
| THELMA I. SEAL and<br>CYNTHIA TARVER CARRANZA | §<br>§<br>§<br>§ | PLAINTIFFS |
| v. | §<br>§<br>§ | Civil No. 1:20cv190-HSO-JCG |
| SOUTHERN ENERGY HOMES, INC.,<br>et al. | §<br>§<br>§ | DEFENDANTS |

### MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS [8], [10] TO COMPEL ARBITRATION AND FOR STAY, AND DENYING DEFENDANT CARLSBAD NATIONAL BANK'S JOINDER [13]

BEFORE THE COURT are the Motions [8], [10] to Compel Arbitration and for Stay filed by Defendant Southern Energy Homes, Inc. and Defendant Steven W. Stanford d/b/a Stanford Mobile Home Sales, respectively, and joined [13] by Defendant Carlsbad National Bank. Plaintiffs Thelma I. Seal and Cynthia Tarver Carranza have filed a Response [14] in opposition to the Motions [8], [10], and Southern Energy Homes, Inc. and Steven W. Stanford each filed rebuttals [16], [17].

Having considered the Motions [8], [10] the related pleadings, the record, and relevant legal authority, the Court is of the opinion that Defendants' Motions [8], [10] should be granted and Plaintiffs should be compelled to arbitrate their claims against Defendants Southern Energy Homes, Inc. and Steven W. Stanford d/b/a Stanford Mobile Home Sales. To the extent Defendant Carlsbad National Bank seeks to compel the arbitration of Plaintiffs' claims by way of its Joinder [13] in the Motions, its request will be denied. This case will be stayed and administratively

closed pending the arbitration of Plaintiffs' claims against Defendant Southern Energy Homes, Inc. and Defendant Steven W. Stanford d/b/a Stanford Mobile Home Sales.

## I. BACKGROUND

A. Factual background

On November 3, 2016, Plaintiff Thelma I. Seal ("Seal") purchased a manufactured home from Defendant Steven W. Stanford d/b/a Stanford Mobile Home Sales ("Stanford") for the total sum of $60,262.94. See Bill of Sale [1-2] at 13. The home had been manufactured by Defendant Southern Energy Homes, Inc. ("Southern Energy") at its Addison, Alabama, plant. See Aff. of Andrew Snuggs [8-2] at ¶ 5.

Seal apparently made a down payment to Stanford and financed the balance of the purchase price by entering into a Promissory Note and Security Agreement (the "Note") with Triad Financial Services, Inc. ("Triad"). See Note [1-2] at 15-19. The Court has not been able to locate an assignment of the Note in the record, but the parties do not appear to dispute that Triad later assigned the Note to Defendant Carlsbad National Bank ("CNB"). See Mem. [9] at 3; Compl. [1-1] at 8.

On the date of purchase, Seal executed a Binding Arbitration Agreement [8-3], with Southern Energy and Stanford, which provided in relevant part that

> You, We and the Dealer (the "Parties") agree to submit to binding arbitration any and all claims and disputes (including contract, tort, common law, statutory and regulatory claims) arising from or relating to the Contract, the Home, the sale of the Home, the design and construction of the Home, the financing and insuring of the Home, all warranties and service contracts offered with the Home, and any other

disputes among the Parties . . . .  For claims and disputes covered by this Agreement, the Parties' rights will be determined by a neutral arbitrator and not a judge or jury.

Agreement [8-3] at 1.

The Agreement contained definitions of the following relevant terms:

"Dealer" means the retail seller named in the Contract, and all agents, employees and subcontractors of the Dealer, including all delivery and set-up contractors.  "Dealer" also means the company that financed the purchase of the Home, the company that insured the Home, the company that provided a supplemental warranty or service contract for the Home, and all employees of those entities.  All such parties are intended third-party beneficiaries of the Agreement.

\* \* \*

"You" shall mean all buyers named in the Contract and all occupants of the Home.  All occupants of the Home, who do not sign this Agreement, are intended third-party beneficiaries of the Agreement.

"We" and "Us" shall mean the company that manufactured the Home.  Your Home was manufactured by one of the flowing [sic] companies: Southern Energy Homes, Inc.; AL/TEX Homes, Inc.; Giles Industries, Inc.; or Cavalier Home Builders, L.L.C.

*Id.*

The home was subsequently delivered and placed on real property owned by Seal and Plaintiff Cynthia Tarver Carranza ("Carranza") (collectively, "Plaintiffs"). Compl. [1-1] at 6; Deed [14-1] at 1.  In March or April 2019, Carranza noticed water leaks in the home and contacted Stanford, Southern Energy, and CNB about the problem.  Compl. [1-1] at 6.  Plaintiffs filed a claim under a homeowner's insurance policy that covered the home, but the claim was denied because an engineering report concluded that the damage was caused by improper construction and repair defects, which were not covered by the policy.  *Id.*

3

B.      Procedural history

Plaintiffs filed a Complaint [1-1] in the Circuit Court of Pearl River County, Mississippi, on November 2, 2019, naming Southern Energy, Stanford, and CNB as Defendants and advancing claims for breach of contract, breach of express warranties, breach of implied warranties, and revocation of acceptance/rescission, as well as claims under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, et seq.  Compl. [1-1] at 7-10.  Southern Energy removed the case to this Court on the basis of federal question jurisdiction, *see* Notice of Removal [1] at 1-3, and Stanford and CNB joined in the removal, *see* Joinders [2], [13].

Southern Energy and Stanford each filed a Motion [8], [10] to Compel Arbitration and for Stay, in which CNB joined [13].  Southern Energy and Stanford argue that they entered into a valid arbitration agreement with Seal, and that Plaintiffs' claims fall within the scope of that agreement.  *See* Mot. [8] at 2; Mem. [9] at 4-5; Mem. [11] at 3-4.  Southern Energy and Stanford assert that Carranza, although not a signatory to the Agreement, was an intended third-party beneficiary under the terms of the Agreement and should also be compelled to arbitrate.  Defendants further assert that, because Carranza is raising claims arising out of the sales contract, she is estopped from denying mandatory arbitration of her claims.  *See* Mot. [8] at 3; Mem. [9] at 1, 6-8; Mem. [11] at 4-5.  Should the Court compel arbitration of less than all of Plaintiffs' claims, Southern Energy and Stanford ask the Court to stay this action pending conclusion of the arbitration. *See* Mem. [9] at 10; Mem. [11] at 6.

CNB filed a Joinder [13] in the Motions [8], [10] and requested that "the Court issue an order compelling referral of all claims made in this action against the Defendants to arbitration and to stay this action pending the results of the arbitration." Joinder [13] at 1. CNB did not file its own motion, nor did it offer any arguments as to why Plaintiffs' claims against it should be arbitrated. *See id.*

Plaintiffs oppose arbitration, arguing that 15 U.S.C. §1639c(e) has rendered the mandatory arbitration provision void and unenforceable as a matter of law. This in turn renders the entire agreement void by its own terms. *See* Resp. [14] at 7-10. As an alternative to binding arbitration, Plaintiffs offer to engage in non-binding mediation. *See id.*

Southern Energy and Stanford take the position in their Rebuttal [17] and Reply [16] that 15 U.S.C. § 1639c(e)(1) does not apply because Plaintiffs' claims do not arise out of a mortgage loan or credit transaction, and the statute does not apply to the sales transaction at issue here. *See* Reply [16] at 2-3; Rebuttal [17] at 2-8. Southern Energy also contends that the Court should refer "gateway issues" concerning enforcement and the scope of the Arbitration Agreement to arbitration. Rebuttal [17] at 8-10.

## II.   DISCUSSION

A.   Relevant legal standards

The Federal Arbitration Act, 9 U.S.C. §§ 1, et seq. ("FAA"), provides that a written agreement to arbitrate in a contract involving interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in

equity for the revocation of any contract." 9 U.S.C. § 2. Section 2 of the FAA creates "a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). The FAA requires courts to enforce arbitration agreements according to their terms. *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010).

A court generally follows a two-step inquiry when resolving a motion under the FAA, first considering "whether the parties formed *any arbitration agreement at all*," and next determining whether the claim in question falls within the scope of that arbitration agreement. *Matter of Willis*, 944 F.3d 577, 579 (5th Cir. 2019), *cert. denied sub nom. Willis v. Tower Loan of Mississippi, LLC*, 140 S. Ct. 2828 (2020) (quotation omitted) (emphasis in original). If both questions are answered in the affirmative, a court must then consider whether any legal constraints external to the agreement foreclose arbitration. *See Tittle v. Enron Corp.*, 463 F.3d 410, 418 (5th Cir. 2006).

The foregoing questions are ordinarily for the court, but parties can enter into an agreement to delegate to an arbitrator the power to decide the "question of arbitrability." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002). Courts presume that parties intend the courts, and not arbitrators, to decide disputes about "arbitrability," including questions such as "whether the parties are bound by a given arbitration clause," or "whether an arbitration clause in a concededly binding contract applies to a particular type of controversy." *BG Grp.,*

*PLC v. Republic of Argentina*, 572 U.S. 25, 34 (2014). However, the United States Supreme Court has repeatedly recognized that parties can agree to arbitrate such "gateway" questions through a so-called delegation clause. *Rent-A-Ctr., W., Inc.*, 561 U.S. at 68-69.

If an agreement appears to contain a delegation clause, a court first applies state law to determine whether the parties formed any arbitration agreement at all, but at the second step, a court must "ask only whether there is a valid delegation clause." *Matter of Willis*, 944 F.3d at 579. If so, "then the *arbitrator* decides whether the claim is arbitrable." *Id.* at 579-80 (emphasis in original). Where the existence of an arbitration agreement has been established and there is a valid delegation clause, "whether that contract may be enforced for or against the parties in the particular case is for an arbitrator to decide." *Bowles v. OneMain Fin. Grp., L.L.C.*, 954 F.3d 722, 725 (5th Cir. 2020).

The Supreme Court has cautioned that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (quotation omitted). If there is clear and unmistakable evidence that the parties intended to arbitrate arbitrability, "the court must grant the motion to compel." *Archer & White Sales, Inc. v. Henry Schein, Inc.*, 935 F.3d 274, 279 (5th Cir. 2019), *cert. granted*, 141 S. Ct. 107 (2020), and *cert. denied*, 141 S. Ct. 113 (2020).

7

B.    Analysis

1.    Whether an arbitration agreement was formed

A court applies state law to determine whether the parties formed any arbitration agreement at all. *See Matter of Willis*, 944 F.3d at 579. While the strong federal policy favoring arbitration applies to the scope of an arbitration agreement, "the policy does not apply to the initial determination whether there is a valid agreement to arbitrate." *Banc One Acceptance Corp. v. Hill*, 367 F.3d 426, 429 (5th Cir. 2004).

"[T]he only issue at the first step is whether there is any agreement to arbitrate any set of claims," which focuses upon the issue of contract formation. *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 202 (5th Cir. 2016). Under Mississippi law, the elements of a contract are "(1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, and (6) no legal prohibition precluding contract formation." *GGNSC Batesville, LLC v. Johnson*, 109 So. 3d 562, 565 (Miss. 2013).

In addition, "when separate documents are executed at the same time, by the same parties, as part of the same transaction, they may be construed as one instrument." *Matter of Willis*, 944 F.3d at 580 (quoting *Sullivan v. Mounger*, 882 So. 2d 129, 135 (Miss. 2004)). In this case, the parties have presented evidence that the Bill of Sale and the Arbitration Agreement were executed on the same day, by at least two of the same parties (Seal and Stanford), and as part of the same

transaction involving the purchase of the manufactured home.   *See* Bill of Sale [1-2] at 13; Agreement [8-3] at 1-2.   The Court therefore construes these documents as one instrument.   *See Matter of Willis*, 944 F.3d at 580.

Plaintiffs do not dispute that Seal entered into a contract with at least one Defendant, and it appears that at least some of the parties formed a binding contract to arbitrate under Mississippi law.   Plaintiffs' arguments against compelling arbitration do not go to contract formation, nor have Plaintiffs raised any defenses to contract formation.   Based upon the record before the Court, it finds that a valid agreement to arbitrate was formed.

2. <u>Whether the Court should refer gateway questions of arbitrability to arbitration</u>

For the first time in its Rebuttal [17], Southern Energy asserts that the Court should refer "gateway issues" concerning enforcement and the scope of the Arbitration Agreement to arbitration.   Rebuttal [17] at 8-10.   This appears to be an argument that the arbitration provision contains a delegation clause.   However, arguments raised for the first time in a reply brief are waived.   *See Dixon v. Toyota Motor Credit Corp.*, 794 F.3d 507, 508 (5th Cir. 2015).

Even if this argument were properly before the Court, Southern Energy has not directed the Court to a valid delegation provision in the Arbitration Agreement. *See* Agreement [8-3] at 1-2.   Southern Energy references a provision stating that "[t]he arbitration will be conducted in accordance with the Home Construction Arbitration Rules of the AAA, except to the extent provided otherwise in this Agreement," Rebuttal [17] at 10; *see* Agreement [8-3] at 2, and then quotes "Rule 7

of the Commercial Arbitration Rules and Mediation Procedures" regarding an arbitrator's powers, *see* Rebuttal [17] at 10.

Although the Arbitration Agreement refers to the "Home Construction Arbitration Rules of the AAA," Agreement [8-3] at 2, Southern Energy relies upon what appears to be a different set of Rules from the American Arbitration Association ("AAA"), namely the "Commercial Arbitration Rules and Mediation Procedures," Rebuttal [17] at 10.   Southern Energy has not cited the Court to any provision of the Home Construction Arbitration Rules that it maintains would delegate power to the arbitrator.   Nor has it otherwise directed the Court to any valid delegation clause in this case.   As such, Southern Energy's request to compel arbitration as to "gateway" questions concerning the question of arbitrability is not well taken and will be denied.   Because Plaintiffs did not clearly and unmistakably agree to submit the question of arbitrability to arbitrate, the Court turns to the question of arbitrability.   *See First Options*, 514 U.S. at 944.

3. <u>Whether the dispute in question falls within the scope of the Arbitration Agreement</u>

"[T]he party seeking to compel arbitration must show that the dispute falls within the scope of the agreement," which is a matter of contract interpretation based upon the language of the arbitration clause itself.   *Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522, 531 (5th Cir. 2019). Courts apply principles of state contract law to ascertain the scope of agreements, including the question of who is bound by them.   *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 (2009).

10

"Congress enacted the FAA to overcome judicial resistance to arbitration and to declare a national policy favoring arbitration of claims that parties contract to settle in that manner." *Vaden v. Discover Bank*, 556 U.S. 49, 58 (2009) (quotations omitted). "When determining the scope of an arbitration clause, courts typically indulge every reasonable presumption in favor of arbitration, and resolve all doubts as to the arbitrability of an issue in favor of arbitration." *Halliburton Energy Servs., Inc.*, 921 F.3d at 537 (quotation omitted). In light of the FAA's strong national policy favoring arbitration of disputes, "all doubts concerning the arbitrability of claims should be resolved in favor of arbitration." *Washington Mut. Fin. Grp., LLC v. Bailey*, 364 F.3d 260, 263 (5th Cir. 2004) (quotation omitted).

The Arbitration Agreement in this case provides that the Parties, as defined therein,

> agree to submit to binding arbitration any and all claims and disputes (including contract, tort, common law, statutory and regulatory claims) arising from or relating to the Contract, the Home, the sale of the Home, the design and construction of the Home, the financing and insuring of the Home, all warranties and service contracts offered with the Home, and any other disputes among the Parties.

Agreement [8-3] at 1. The United States Court of Appeals for the Fifth Circuit has held that "a contract clause submitting '*all* disputes, claims, or controversies arising from or relating to' the agreement to arbitration" constitutes broad coverage language. *Robinson v. J & K Admin. Mgmt. Servs., Inc.*, 817 F.3d 193, 196 (5th Cir. 2016) (emphasis in original).

On its face, the Arbitration Agreement appears broad enough to encompass the dispute in this case, at least with respect to the signatories to the contract, Seal,

11

Stanford Mobile Homes, and Southern Estates. *See* Agreement [8-3] at 2. The Parties who agreed to submit to binding arbitration were "You," meaning "all buyers defined in the Contract and all occupants of the Home"; "We," meaning the manufacturer Southern Energy; and the "Dealer," meaning the retail seller Stanford and others, including "the company that financed the purchase of the Home." *Id.* at 1. While Plaintiffs argue that their claims fall outside the scope of the Arbitration Agreement, that argument is intertwined with their contention that 15 U.S.C. § 1639c(e) renders the arbitration provision void. *See* Resp. [14] at 10. The Court will address Plaintiffs' argument on this issue when it resolves the question of whether there are any legal constraints foreclosing arbitration.

In sum, based upon the plain language of the arbitration provision itself, signatories Southern Energy and Stanford have shown that the dispute between them and Seal, who is also a signatory, falls within the scope of the agreement, and their Motions will be granted as to Seal. The more complex questions are whether Southern Energy and Stanford can compel nonsignatory Carranza to arbitrate, and whether nonsignatory CNB can compel either Seal or Carranza to do so.

a.  <u>Southern Energy's and Stanford's requests to compel Carranza to arbitrate</u>

Southern Energy and Stanford seek to compel Carranza to arbitrate her claims against them, but she was not a signatory to either the Bill of Sale or Arbitration Agreement. *See* Bill of Sale [1-2] at 13; Agreement [8-3] at 1-2. Nor have Defendants pointed to any evidence that Carranza was a signatory to any document that was executed on the same date as the Bill of Sale or Arbitration

12

Agreement.

"Who is actually bound by an arbitration agreement is a function of the intent of the parties, as expressed in the terms of the agreement." *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 355 (5th Cir. 2003). The Fifth Circuit has acknowledged that, so long as there is some written agreement to arbitrate, a nonsignatory may be bound under certain circumstances. *Id.* at 356. The Fifth Circuit has recognized the following six theories under which a nonsignatory may be bound by an arbitration agreement: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; (5) estoppel; and (6) third-party beneficiary. *Id.*

Southern Energy and Stanford take the position that Carranza is required to arbitrate her claims against them based upon a theory of direct benefits estoppel. *See* Mem. [9] at 6-8; Mem. [11] at 4-5. Stanford further posits that Carranza qualifies as a third-party beneficiary. *See* Mem. [11] at 4-5.

"Direct benefits estoppel applies when a nonsignatory knowingly exploits the agreement containing the arbitration clause." *Bridas S.A.P.I.C.*, 345 F.3d at 361-62 (quotation omitted). In cases applying direct benefits estoppel, a nonsignatory has brought suit against a signatory premised in part upon the agreement. *See id.* at 362. The Mississippi Supreme Court has held that direct benefits estoppel involves nonsignatories who, during the life of a contract, embrace the contract despite their nonsignatory status, but then repudiate the arbitration clause contained in the contract during litigation. *See KPMG, LLP v. Singing River*

13

*Health Sys.*, 283 So. 3d 662, 675 (Miss. 2018). A nonsignatory can "embrace" a contract in one of two ways: (1) "by knowingly seeking and obtaining direct benefits from that contract," or (2) "by seeking to enforce the terms of that contract or asserting claims that must be determined by reference to that contract." *Olshan Found. Repair Co. of Jackson, LLC v. Moore*, 251 So. 3d 725, 731 (Miss. 2018) (quotation omitted).

Carranza has asserted breach of contract and breach of express warranty claims against all Defendants "regarding the manufacture, sale, purchase, delivery, and/or set up of the subject home on the site on the real property of Carranza." Compl. [1-1] at 10, 11. Carranza has plainly sought to enforce the contract and has advanced claims that must be determined by reference to that contract. Therefore, Carranza has embraced the contract while also attempting to repudiate the Arbitration Agreement. *See KPMG, LLP*, 283 So. 3d at 675; *Olshan Found. Repair Co. of Jackson, LLC*, 251 So. 3d at 731. Carranza has "exploited" the Sales Agreement to a degree that direct benefits estoppel should apply as to her claims against Southern Energy and Stanford, and she should be compelled to arbitrate her claims against them.[1]

b. <u>CNB's request to compel Plaintiffs to arbitrate</u>

CNB filed no motion of its own, but merely joined [13] in Southern Energy's and Stanford's Motions [8], [10]. Under the Court's Local Uniform Civil Rule 7(b),

---

[1] Because the Court finds that direct benefits estoppel applies, it need not resolve Stanford's additional argument that Carranza qualifies as a third-party beneficiary. *See* Mem. [11] at 4-5.

14

"[a]ny written communication with the court that is intended to be an application for relief or other action by the court must be presented by a motion in the form prescribed by this Rule." L.U. Civ. R. 7(b). CNB's request to compel Plaintiffs to arbitrate their claims against it is not properly before the Court, and should be denied for this reason.

Even if its Joinder [13] were sufficient under the Local Rules, CNB has not adequately articulated any factual or legal basis for compelling either Seal or Carranza to arbitrate their claims against it. CNB has not explained whether, or if so how, it qualifies as a signatory to or was a defined party in the Arbitration Agreement [8-3].[2] While the Agreement includes in the definition of "Dealer" "the company that financed the purchase of the Home," Agreement [8-3] at 1, Triad was the company that initially financed Plaintiffs' home, even though the Note was apparently later assigned to CNB, *see* Mem. [9] at 3; Compl. [1-1] at 8. CNB has not adequately addressed this issue.[3] Therefore, even if CNB's request were properly before the Court, its request to compel Plaintiffs to arbitrate is insufficient and should be denied at this time.

---

[2] The Court is aware of the existence of caselaw addressing whether a nonsignatory may compel a signatory to arbitrate its claims. *See, e.g., Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 527-28 (5th Cir. 2000) (addressing intertwined-claims test and explaining that each case "turns on its facts"). However, CNB has not adequately addressed or briefed whether the Court can compel either Plaintiff to arbitrate its claims against it as a nonsignatory, particularly where one Plaintiff, Carranza, is also a nonsignatory.

[3] Moreover, CNB has not addressed its position as an assignee of the Note and whether arbitration of Plaintiffs' claims against it would be prohibited by 15 U.S.C. § 1639c(e)(1). The Court addresses this statute below with respect to Southern Energy and Stanford, but they are arguably in a different position than CNB since there is no evidence that either Southern Energy or Stanford extended credit for the home purchase.

15

4. <u>Whether any legal constraints foreclose arbitration</u>

The Court must next consider whether any legal constraints foreclose arbitration of Plaintiffs' claims against Southern Energy and Stanford. *See Tittle*, 463 F.3d at 418. Plaintiffs contend that 15 U.S.C. § 1639c(e) renders void the mandatory arbitration provision in the Arbitration Agreement. *See* Resp. [14] at 7-10.

"Like any statutory directive, the Arbitration Act's mandate may be overridden by a contrary congressional command." *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226-27 (1987). The party opposing arbitration bears the burden of demonstrating that Congress intended to prohibit arbitration by enacting a particular statute. *See id.*

Section 1639c(e)(1) provides as follows:

> No residential mortgage loan and no extension of credit under an open end consumer credit plan secured by the principal dwelling of the consumer may include terms which require arbitration or any other nonjudicial procedure as the method for resolving any controversy or settling any claims arising out of the transaction.

15 U.S.C. § 1639c(e)(1).

A "residential mortgage loan" is defined as

> any consumer credit transaction that is secured by a mortgage, deed of trust, or other equivalent consensual security interest on a dwelling or on residential real property that includes a dwelling, other than a consumer credit transaction under an open end credit plan or, for purposes of section[ ] . . . 1639c of this title . . . , an extension of credit relating to a plan described in section 101(53D) of Title 11.

15 U.S.C. § 1602(dd)(5).[4]  "The term 'credit' means the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment," 15 U.S.C. § 1602(f), while an "open end consumer credit plan" is defined as "a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance," 15 U.S.C. § 1602(j).

The evidence before the Court is clear that Seal purchased a home from Stanford that had been manufactured by Southern Energy, but there is no evidence that either Stanford or Southern Energy extended credit to either Plaintiff for the purchase of the home, or that Plaintiffs' claims against Southern Energy and Stanford in any way arise out of a "consumer credit transaction that is secured by a dwelling."  15 U.S.C. § 1602(dd)(5).  Indeed, it was an entirely separate entity, Triad, that financed the remaining balance on the purchase.  *See* Note [1-2] at 15-19.

Plaintiffs contend that this exception applies because the contract was to be paid in installments, *see* Resp. [14] at 8-9, but there is no indication from any of the contract documents between Seal and Stanford or Southern Energy that there was an installment agreement between those parties, or that any such credit transaction was secured by the mobile home Plaintiff purchased.  Plaintiffs have pointed to no

---

[4]  Section 101(53D) of Title 11 relates to a "timeshare plan" and a "timeshare interest," which are not relevant here.  *See* 11 U.S.C. § 101(53D).

17

persuasive evidence, other than the fact of the mere purchase of the home from Stanford, that shows that this exclusion would apply to the otherwise broad arbitration provision. Based upon the record and relevant law, the Court concludes that Plaintiffs' claims against Southern Energy and Stanford are encompassed by the Arbitration Agreement and do not fall within the statutory exclusion upon which they rely.

Plaintiffs have not carried their burden of demonstrating that Congress intended to prohibit arbitration under the facts of this particular case. *See Shearson/Am. Exp., Inc.*, 482 U.S. at 226-27. Because Plaintiffs have not shown the existence of any legal constraints foreclosing arbitration of their claims against Southern Energy and Stanford, the Motions to Compel Arbitration should be granted as to these two Defendants.

C.     Southern Energy's and Stanford's requests for a stay

Southern Energy and Stanford ask that, should the Court compel arbitration of less than all of Plaintiffs' claims, the Court stay this action pending conclusion of the arbitration. *See* Mem. [9] at 10; Mem. [11] at 6. Because the Court will deny CNB's request to compel arbitration, it turns to Southern Energy's and Stanford's requests for a stay.

Section 3 of the FAA provides that when a suit is referable to arbitration pursuant to a written arbitration agreement, a court generally "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . ." 9 U.S.C. § 3. "If a dispute is

18

subject to mandatory grievance and arbitration procedures, then the proper course of action is usually to stay the proceedings pending arbitration." *Ruiz v. Donahoe*, 784 F.3d 247, 249 (5th Cir. 2015).

In light of this authority, the Court finds that Southern Energy's and Stanford's requests to stay this matter pending arbitration are well taken and should be granted. This matter will be stayed and the case administratively closed pending the outcome of the arbitration of Plaintiffs' claims against Defendants Southern Energy and Stanford.

### III. CONCLUSION

To the extent the Court has not addressed any of the parties' arguments, it has considered them and determined that they would not alter the result. Defendants Southern Energy's and Stanford's Motions [8], [10] to Compel Arbitration and for Stay will be granted, and CNB's Joinder [13] will be denied without prejudice to the extent it requests that Plaintiffs be compelled to arbitrate their claims against CNB.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, the Motions [8], [10] to Compel Arbitration and for Stay filed by Defendant Southern Energy Homes, Inc. and Defendant Steven W. Stanford d/b/a Stanford Mobile Home Sales are **GRANTED**, and Plaintiffs Thelma I. Seal and Cynthia Tarver Carranza are **ORDERED** to submit their claims against Defendants Southern Energy Homes, Inc. and Steven W. Stanford d/b/a Stanford Mobile Home Sales to arbitration.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, Defendant

Carlsbad National Bank's Joinder [13], to the extent it seeks to compel arbitration of Plaintiffs' claims against it, is **DENIED WITHOUT PREJUDICE**.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, this case is **STAYED and ADMINISTRATIVELY CLOSED** for statistical purposes pending the outcome of the arbitration of Plaintiffs' claims against Defendants Southern Energy Homes, Inc. and Steven W. Stanford d/b/a Stanford Mobile Home Sales.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, the parties shall move to lift the stay and reinstate this case to the active docket within 30 days after the conclusion of the arbitration.

**SO ORDERED AND ADJUDGED**, this the 26th day of January, 2021.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE